### MT. HAWLEY INSURANCE CO.

#### v.

### GOLDEN EAGLE INSURANCE CORP.
#### and Does 1–10, inclusive.

#### Case No. CV 09–0150–RC.

United States District Court,
C.D. California.

Aug. 5, 2009.

---

Peter J. Schulz, for Plaintiff.

Richard P. Edwards, for Defendant.

## PROCEEDINGS: ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

ROSALYN M. CHAPMAN, United States Magistrate Judge.

On June 23, 2009, plaintiff Mt. Hawley Insurance Company filed a notice of motion and motion for summary judgment or, in the alternative, partial summary judgment, a supporting memorandum of points and authorities, a statement of uncontroverted facts and conclusions of law, and the supporting declarations of Kelley Anderson, Andy Anderson, Rex Porter with exhibits, Richard Spunt with exhibits, Jack Lewis with exhibits, and Peter J. Schulz with exhibits. On July 1, 2009, defendant Golden Eagle Insurance Corporation filed an opposition to the motion for summary judgment, a memorandum of points and authorities in opposition, a statement of undisputed and disputed facts in opposition, a statement of genuine issues in opposition, and the declaration of Ishai Klir. On July 8, 2009, plaintiff filed a reply and the declaration of Glenn Asakawa. On July 21, 2009, defendant filed its objections to Mr. Asakawa's declaration, contending it is "new evidence" that defendant should have an opportunity to address,[1] and the supplemental declaration of Ishai Klir. Oral argument was held before Magistrate Judge Rosalyn M. Chapman on August 5, 2009.

## I

Federal Rule of Civil Procedure 56(c) authorizes the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Judgment must be entered "if . . . there can be but one reasonable conclusion as to the verdict. . . . [However, i]f reasonable minds could differ," judgment should not be entered in favor of the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of identifying the elements of the claim in the pleadings, or other evidence which the moving party "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *MetroPCS, Inc. v. City & County of San Francisco,* 400 F.3d 715, 720 (9th Cir.2005). "Material facts are those which may affect the outcome of the case." *Long v. County of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006). The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *Porter v. Cal. Dep't of Corr.,* 419 F.3d 885, 891 (9th Cir.2005).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie,* 526 U.S. 541,

---

1. The Court finds that Mr. Asakawa's declaration is, in fact, "new evidence" submitted in response to defendant's opposition to plaintiff's motion for summary judgment, but since defendant has filed the supplemental declaration of Mr. Klir in response to the new evidence, the Court will consider both Mr. Asakawa's declaration and the supplemental declaration of Mr. Klir. *JG v. Douglas County Sch. Dist.,* 552 F.3d 786, 803–04 n. 14 (9th Cir.2008); *Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir.1996), *cert. denied,* 522 U.S. 808, 118 S.Ct. 48, 139 L.Ed.2d 14 (1997).

552, 119 S.Ct. 1545, 1551–52, 143 L.Ed.2d 731 (1999) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513); *Groh v. Ramirez*, 540 U.S. 551, 562, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068 (2004). However, more than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Galen*, 477 F.3d at 658. Rather, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001) (en banc).

## II

The parties' undisputed evidence establishes the following findings of fact: Adler Realty Investments ("Adler"), a developer, entered into a written agreement with Coury Enterprises, Inc. ("Coury"), a general contractor, to construct the Agoura Design Center, a new commercial center which would house retail furniture and other home furnishing stores and showrooms in Agoura Hills, California ("the Project"). Plaintiff's Undisputed Material Facts ("UMF") 1–2; Declaration of Richard Spunt ("Spunt Decl.") ¶¶ 2–4; Declaration of Kelley Anderson ("K. Anderson Decl.") ¶ 3. On September 20, 2006, Coury entered into an agreement with Advanced Landscape 2000, Inc. ("Advanced") for Advanced to act as a subcontractor on the Project, performing landscaping and irrigation work.[2] UMF 3; Spunt Decl. ¶ 5, Exh. A.

On September 30, 2007, water discharged from a sprinkler system Advanced installed, causing significant damage to part of the Project—the exterior and interior of an Ethan Allen showroom and its furnishings. UMF 8, 23–24; Spunt Decl. ¶¶ 7, 9; Declaration of Andy Anderson ("A. Anderson Decl.") ¶ 5; K. Anderson Decl. ¶ 5. The damage to the Ethan Allen showroom and its furnishings "was caused when ... water shot up from malfunctioning sprinklers located in the planter at the foot of the [Ethan Allen] wall." Declaration of Rex Porter ¶¶ 6–8. The damage to the Ethan Allen showroom caused a nearly two-month delay in the showroom's opening to the public, and repairs to the showroom were required. UMF 9, 25; Spunt Decl. ¶ 8.

Effective June 30, 2007, Mt. Hawley issued Commercial General Liability Policy no. MGL0151902 ("Mt. Hawley Policy") to Coury, covering the period to June 30, 2008. UMF 40; Declaration of Jack Lewis ("Lewis Decl.") ¶¶ 2–3, Exh. A. The Mt. Hawley Policy includes the following modification of the commercial general liability conditions:

> SECTION IV, Paragraph 4.b. of the **COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended by addition of the following:
>
> (3) This insurance is excess over any other insurance whether primary, excess, contingent or on any other basis that is available to you as an additional insured or contractual indemnitee

2. Paragraph 2.6 of this agreement provides:
   Whether or not shown by the plans or mentioned in the specification, the work includes the following: (a) Any item of labor, service, and/or material reasonably inferred by the plans and specifications or customarily furnished by a TRADE CONTRACTOR performing work in this line. (b) Any item

[of] labor, service or material required to make the work comply with any ordinance or regulation. (c) All plans, drawings, permits and fees required by law, regulations, ordinance, or building codes. (d) All scaffolding necessary or required for the performance of the work.
Spunt Decl. ¶ 5, Exh. A.

under a policy issued to a subcontractor....

\*     \*     \*

"Potential insurers" means all insurance companies who may be obligated to defend the insured as either a named insured or an additional insured. "Potential insurers" include the insurers of all subcontractors who were contractually obligated to name the insured as an additional insured on their own insurance policy(ies).

UMF 41; Lewis Decl. ¶ 3, Exh. A.

Under the Mt. Hawley Policy, plaintiff paid $67,238.70 to Adler for property dam-age to the Project and $17,073.05 to Ethan Allen Retail, Inc. ("Ethan Allen") for property damage to its showroom. UMF 10–11; Lewis Decl. ¶ 5, Exhs. B–C. However, Ethan Allen claims it also lost approximately $299,146.00 in business for the delay in its grand opening to the public, and this claim is unresolved. UMF 12–13; Lewis Decl. ¶ 6, Exh. D; Declaration of Peter J. Schulz ("Schulz Decl.") ¶ 10.

Effective April 1, 2007, defendant Golden Eagle issued Commercial General Liability Policy no. 8261906 ("Golden Eagle Policy") to Advanced, covering the period to April 1, 2008.[3] UMF 29; Schulz Decl.

3. The Golden Eagle Policy has a "Commercial Liability Gold Endorsement" which modifies the definition of who is an insured, as follows:

A. ADDITIONAL INSUREDS—BY CONTRACT, AGREEMENT OR PERMIT
1. Paragraph 2, under **SECTION II— WHO IS AN INSURED** is amended to include as an insured any person or organization *when you and such person or organization have agreed in writing in a contract, agreement or permit that such person or organization be added as an additional insured on your policy to provide insurance such as is afforded under this Coverage Part,* Such person or organization ... is an additional insured only with respect to liability arising out of:
    a. Your ongoing operations performed for that person or organization; or
    b. Premises or facilities owned or used by you.
With respect to provision 1.a. above, a person's or organization's status as an insured under this endorsement ends when your operations for that person or organization are completed.

\*     \*     \*

2. This endorsement provision A. does not apply:
    a. Unless the written contract or agreement has been executed, or permit has been issued, prior to this "bodily injury," "property damage" or "personal and advertising injury";
    b. To "bodily injury" or "property damage" occurring after:

    (1) All work, including materials, parts or equipment furnished in connection with such work, in the project ... to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or
    (2) That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project;
    c. To the rendering of or failure to render any professional services including, but not limited to, any professional architectural, engineering or surveying services....
    d. To "bodily injury", "property damage" or "personal and advertising injury" arising out of any act, error or omission that results from the additional insured's sole negligence or wrongdoing;
    e. To any person or organization included as an insured under provision B. of this endorsement;
    f. To any person or organization included as an insured by a separate additional insured endorsement issued by us and made a part of this policy.
UMF 31; Schulz Decl. ¶ 5, Exh. C (emphasis added). A second endorsement further modifies the definition of an insured, providing:
This endorsement modifies insurance provided under the following: [¶] COMMERCIAL GENERAL LIABILITY COVERAGE PART
**SCHEDULE**

¶ 4, Exh. B. The Golden Eagle Policy- provides insurance coverage for "property damage" on an "occurrence" basis.[4] UMF 29–30; Schulz Decl. ¶ 4, Exh. B. On October 29, 2007, plaintiff tendered its claim for property-damage and business loss to Advanced and defendant, and on September 26, 2008, plaintiff sent a follow-up letter to Advanced and defendant. UMF 36–37; Lewis Decl. ¶¶ 7–8, Exhs. E–F. However, defendant verbally advised plaintiff it is not responsible for, and will not reimburse plaintiff for, the property damage, and it will not fund a settlement with Ethan Allen for the business loss claim. UMF 38; Lewis Decl. ¶ 9.

### III

Although the parties appear to agree that "[t]he flood was the result of the release of a substantial quantity of water through the irrigation pipes installed and maintained by Advanced[,]" K. Anderson Decl. ¶ 5; A. Anderson Decl. ¶ 5, they dispute who is responsible for the damage and losses to the Project.

**Name Of Additional Insured Person(s) Or Organization(s):**
ANY PERSON OR ORGANIZATION FOR WHICH A CERTIFICATE OF INSURANCE IS ON FILE WITH THE COMPANY.

\* \* \*

A. **SECTION II—WHO IS AN INSURED** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
 1. Your acts or omissions;
 2. The acts or omissions of those acting on your behalf;
in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.
B. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply: [¶] This insurance does not apply to "bodily injury" or "property damage" occurring after:
 1. All work, including materials, parts or equipment furnished in connection with such work, on the project ... to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
 2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
UMF 32; Schulz Decl. ¶ 6, Exh. D. The plaintiff asserts these endorsements, as well as another endorsement not relevant here, make Coury an additional insured under the Golden Eagle Policy. *See* Plaintiff's Memorandum of Points and Authorities at 17:22–22:22. The defendant does not dispute that, as a general matter, Coury is an additional insured under the Golden Eagle Policy, *see* Defendant's Opposition at 3:10–11 ("Golden Eagle did insure Advanced and it did name Coury as an additional insured under its insurance policies."), but contends there are disputed issues of fact regarding whether the Golden Eagle Policy covers the Project's losses.

4. The Golden Eagle Policy also provides that:
 If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of the Coverage Part, our obligations are limited as follows:
 a. Primary Insurance [¶] This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary....
 b. Excess Insurance [¶] This insurance is excess over:
  (1) Any of the other insurance, whether primary, excess, contingent or on any other basis:
  (a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work":
   \* \* \*
  (2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.
UMF 35; Schulz Decl. ¶ 9, Exh. G.

On the one hand, plaintiff claims the flood was due to "Advanced's failure to ensure that the [irrigation] system was offline, or at a minimum, its failure to have properly sealed and capped off the heads of the irrigation pipes before the weekend, that caused the flood on September 30, 2007." K. Anderson Decl. ¶ 10; A. Anderson Decl. ¶ 13. "The risers for the sprinkler system did not have aerators attached, nor were they capped. This was effectively the same as having open-ended pipes." A. Anderson Decl. ¶ 7. In fact, "there were uncapped irrigation pipes right along the windows of the Ethan Allen furniture store. While the pipes did have sprinkler 'heads,' the sprinkler heads did not contain the orifice on the inside that blocks or directs spray." K. Anderson Decl. ¶ 7.

Plaintiff's expert, Glenn Asakawa, a licensed landscape architect, after reviewing the landscape irrigation plans Wynn Landscape Architects, Inc. prepared, as well as the contract between Coury and Advanced, specifically paragraph 2.6 of that agreement, is of the opinion that the custom and practice in the landscape contractor's business is "that Advanced Landscape had the responsibility to include a master shut-off valve with its installation" regardless of "whether the master-shut off valve and flow regulator were listed in the [landscape] design plans and specifications." Declaration of Glenn Asakawa ("Asakawa Decl.") ¶¶ 1, 4–8. In fact, "the master shut-off valve and flow regulator are standard for irrigation systems of this type in Southern [California] and commonly included in irrigation systems such as this[,]" as Advanced knew. Asakawa Decl. ¶ 6.

Plaintiff also claims Andy Anderson, one of Coury's superintendents, "told Advanced that the owner [Adler] had instructed them to disable the irrigation system and not to have it tied to the clock so that there was no chance that water could flow from the irrigation system into the planters adjacent to the [Ethan Allen] window while work was being performed in those areas." A. Anderson Decl. ¶ 9. Further, Advanced's supervisor and owner told the Project's supervisor, Kelley Anderson, that the irrigation system was not active, K. Anderson Decl. ¶¶ 8–9, and Advanced's supervisor also assured Andy Anderson that the irrigation system was not online and was not capable of generating any water flow. A. Anderson Decl. ¶ 10.

On the other hand, defendant claims Advanced had no input into the design of the irrigation system, which had "engineering failures," such as no master shut-off valve and no flow regulator, and these "engineering failures were below the standard of systems currently being designed in Southern California." Declaration of Ishai Klir ("Klir Decl.") ¶¶ 3–5. Further, defendant claims "Advanced's subcontract with Coury required that Advanced conform strictly with the plans and specifications for the irrigation system that were prepared on behalf of Coury and provided to Advanced"; Advanced "fully and completely complied with the plans and specifications provided by Coury"; and Coury never prepared or presented a change order concerning the changes Kelley and Andy Anderson requested, although Advanced's subcontract with Coury required all changes be in writing and signed by both parties. Klir Decl. ¶¶ 3, 7. In fact, Advanced "did not believe that [it] w[as] authorized to add to the irrigation system any components which [it] felt would improve the system even if such components were 'standard' or 'custom.'... It was [Advanced's] understanding that Coury had retained an irrigation system design professional to design this irrigation system and that [Advanced's] duty was to follow the irrigation plan which [it] w[as] given by the design professional." Supple-

mental Declaration of Ishai Klir ("Supp. Klir Decl.") ¶¶ 6–7. Moreover, defendant disputes that "a master shut-off valve" and "a flow regulator" are "customarily furnished" in landscape and irrigation systems like the Project. Supp. Klir Decl. ¶¶ 4–5.

Finally, defendant claims that "[n]o one, and especially neither Kelley Anderson nor Andrew Anderson, ever spoke to any principal at Advanced regarding disabling the irrigation system. No one at Advanced with authority to change the scope of the work was ever consulted about disabling the irrigation system." Klir Decl. ¶ 8. Finally, defendant claims Coury failed to assure that the wall adjacent to Ethan Allen's showroom was properly waterproofed, which would have prevented the loss, and that the drain adjacent to Ethan Allen's showroom was above ground-level, making it impossible for water to enter the drain lines. Klir Decl. ¶¶ 6, 9(c-d). After the water damage occurred, one of Advanced's principals visited the Project and observed the valve to the timer was disconnected, and the valve appeared to have been manually opened. Klir Decl. ¶ 9(a-b).

## IV

▆ An insurance company's duty to defend arises from the contractual provisions contained in its standard comprehensive or commercial general liability insurance policies. *Aerojet–General Corp. v. Transport Indemnity Co.*, 17 Cal.4th 38, 57–59, 70 Cal.Rptr.2d 118, 129–30, 948 P.2d 909 (1997); *Buss v. Superior Court*, 16 Cal.4th 35, 45–47, 65 Cal.Rptr.2d 366, 373, 939 P.2d 766 (1997). Here, the Golden Eagle Policy states that it has "the right and duty to defend the insured against any 'suit' seeking . . . damages" for bodily injury or property damage. Schulz Decl. ¶ 4, Exh. B. The Golden Eagle Policy then defines "suit" as:

> a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which the insurance applies are alleged. "Suit" includes: [¶] a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or [¶] b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

*Id.*

The plaintiff seeks partial summary judgment for declaratory relief on its claim that defendant Golden Eagle "owes a primary duty to defend Coury in relation to claims arising out of the water discharge incident[.]" Motion at 2:9–13. Yet, plaintiff has not established a vital element of its claim for declaratory relief regarding defendant's duty to defend, i.e., plaintiff has not shown that any "suit" has been filed against Coury. Absent such "suit," defendant has no duty to defend Coury under the terms of the Golden Eagle Policy,[5] and plaintiff's request for partial summary judgment on this claim must be denied. *See Foster–Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal.4th 857, 886,

---

5. In essence, plaintiff seeks an advisory opinion about defendant Golden Eagle's duty to defend Coury in the event Ethan Allen sues Coury. However, "[t]he declaratory judgment procedure . . . in the federal courts . . . may not be made the medium for securing an advisory opinion in a controversy which has not arisen." *Coffman v. Breeze Corps., Inc.*, 323 U.S. 316, 324, 65 S.Ct. 298, 302–03, 89 L.Ed. 264 (1945); *see also Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007) ("When presented with a claim for a declaratory judgment, . . . federal courts must take care to ensure the presence of an actual case or controversy, such that the judgment does not become an unconstitutional advisory opinion.").

77 Cal.Rptr.2d 107, 127, 959 P.2d 265 (1998) (" 'The duty to defend arises when the insured tenders defense of [a] third party lawsuit to the insurer.' Prior to the filing of a complaint, there is nothing for the insured *to tender defense of,* and hence no duty to defend arises." (citation omitted; emphasis in original)); *Icasiano v. Allstate Ins. Co.,* 103 F.Supp.2d 1187, 1191 (N.D.Cal.2000) ("[T]he insurer's obligation to defend and investigate is not triggered until Plaintiff tenders the defense of a third[-]party lawsuit to the insurer.... In the absence of the tender of a third-party lawsuit, [insurer's] duty to indemnify Plaintiff did not somehow trigger a pre-tender duty to defend Plaintiff.").

## V

■ "In general, indemnity refers to 'the obligation resting on one party to make good a loss or damage another party has incurred.' " *Prince v. Pacific Gas & Elec. Co.,* 45 Cal.4th 1151, 1157, 90 Cal. Rptr.3d 732, 737, 202 P.3d 1115 (2009) (quoting *Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 452, 532 P.2d 97 (1975)). There are two basic types of indemnity: express indemnity, which is indemnity expressly provided for by contract, and equitable indemnity. *Prince,* 45 Cal.4th at 1157, 90 Cal. Rptr.3d at 737, 202 P.3d 1115; *Bay Development, Ltd. v. Superior Court,* 50 Cal.3d 1012, 1029 n. 10, 269 Cal.Rptr. 720, 730 n. 10, 791 P.2d 290 (1990). Here, plaintiff seeks equitable indemnification in the amount of $84,311.75, the total amount of damages plaintiff has already paid Adler and Ethan Allen. Motion at 2:4–8. Plaintiff also seeks declaratory relief on its claim that defendant Golden Eagle must indemnify Coury in relation to Ethan Allen's unresolved business loss claim. *Id.* at 2:13–15.

■ "Equitable indemnity applies in cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party." *United Servs. Auto. Ass'n v. Alaska Ins. Co.,* 94 Cal.App.4th 638, 644–45, 114 Cal.Rptr.2d 449 (2001) (citation and internal quotation marks omitted). Thus, "an insurer may settle a claim against its insured without prejudice to its right to seek equitable indemnity from other insurers potentially liable on the same risk on the ground that, although the settling insurer's policy does not provide coverage, there *is* coverage under the other policies." *Mitchell, Silberberg & Knupp v. Yosemite Ins. Co.,* 58 Cal.App.4th 389, 394–95, 67 Cal.Rptr.2d 906 (1997) (emphasis in original); *Lexington Ins. Co. v. Sentry Select Ins. Co.,* 2009 WL 1586938, *18 (E.D.Cal.). "The ultimate determination of whether or not indemnity should be allowed depends upon the circumstances of each case, and is generally a factual question." *Aetna Life & Cas. Co. v. Ford Motor Co.,* 50 Cal.App.3d 49, 53, 122 Cal.Rptr. 852 (1975) (citations omitted).

■ The subcontract agreement between Coury and Advanced specifically addresses Advanced's duty to indemnify Coury, providing:

> In the event [Coury] or Owner shall have a claim made against them for, or become involved in litigation or arbitration because of claims for ... property damage ... or any other type of claims, damages, injury or loss arising out of or related to the activities of or the work performed (including any addenda to this Trade AGREEMENT, "extras" or written or verbal change orders to this AGREEMENT) by [Advanced], its agents, employees, servants or TRADE subcontractors, it is the express intent of the parties to this AGREEMENT that [Advanced] shall indemnify, defend and hold [Coury] and Client/Owner (the "INDEMNITEES") harmless, to the

maximum extent permitted by law, against any and all such claims, damages, injury, loss, liability and expense, including but not limited to, attorneys' fees and expert ... fees incurred as a result thereof. It is expressly agreed and understood by [Advanced] and [Coury] that the obligations imposed upon [Advanced] by this provision are unequivocally binding, valid and enforceable and are intended to apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of [Advanced], and are enforceable even if it is claimed or established that [Coury] or Client/Owner was actively or passively negligent, strictly liable in tort or otherwise responsible for any such claims, damages, injury, loss, liability or expense. Notwithstanding the foregoing, [Advanced] shall not be obligated to indemnify the INDEMNITEES to the extent such Liability is caused by the negligence or willful misconduct of the INDEMNITEES; and (ii) nothing herein shall be construed to require [Advanced] to indemnify the INDEMNITEES for Liability arising from the sole negligence or willful misconduct of the INDEMNITEES. The parties hereto agree that it is their mutual intention to create a specific indemnity agreement, and not a "Type I" indemnity, by these provisions.[6]

Spunt Decl. ¶ 5, Exh. A (footnote added).[7] "Where ... the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity." *Rossmoor Sanitation, Inc.*, 13 Cal.3d at 628, 119 Cal.Rptr. at 452, 532 P.2d 97. " 'However, *Rossmoor* did not purport to establish a general rule that a contractual indemnification agreement between an insured and a third party takes precedence over well-established general rules of primary and excess coverage in an action between insurers....' " *Travelers Cas. & Surety Co. v. American Equity Ins. Co.*, 93 Cal.App.4th 1142, 1153–54, 113 Cal.Rptr.2d 613 (2001) (quoting *Reliance Nat'l Indem. Co. v. General Star Indem. Co.*, 72 Cal.App.4th 1063, 1081, 85 Cal.Rptr.2d 627 (1999)). Rather, the Court must "assess whether the factual circumstances create[ ] a relationship

6. "A 'Type I' agreement provides 'expressly and unequivocally' that the indemnitor is to indemnify the indemnitee for, among other things, the negligence of the indemnitee. Under this type of provision, the indemnitee is indemnified whether his liability has arisen as the result of his negligence alone, or whether his liability has arisen as the result of his co-negligence with the indemnitor." *Parkwoods Cmty. Ass'n v. Cal. Ins. Guar. Ass'n*, 141 Cal. App.4th 1362, 1365 n. 2, 46 Cal.Rptr.3d 921 (2006) (citations and some internal quotation marks omitted).

7. The agreement also requires Advanced to "procure and maintain" insurance coverage for Coury, including general liability insurance, and:

[Coury], its officers, directors and employees, Owner, and other interested parties as designated by [Coury] shall be named as additional insured under the Commercial General Liability Policy and such insurance afforded the additional insured shall apply as primary insurance. Any other insurance maintained by [Coury] or Owner shall not be called upon to contribute with this insurance. A policy endorsement must be attached to the Certificate of Insurance submitted to COURY ENTERPRISES, INC., wherein the [Advanced] Commercial General Liability coverage is affirmed to be primary and each other coverage as is carried by COURY ENTERPRISES, INC., is acknowledged to be non-contributory.

UMF 6; Spunt Decl. ¶ 5, Exh. A. In accordance with this provision, Advanced provided Coury with a Certificate of Liability Insurance specifically stating Coury was an additional insured under Advanced's policy with defendant Golden Eagle. UMF 7; Spunt Decl. ¶ 6, Exh. B.

between the indemnity contract and the insurance allocation issues. . . ." *Hartford Cas. Ins. Co. v. Mt. Hawley Ins. Co.,* 123 Cal.App.4th 278, 289, 20 Cal.Rptr.3d 128 (2004) (citation and internal quotation marks omitted); *Travelers Cas. & Surety Co.,* 93 Cal.App.4th at 1154, 113 Cal.Rptr.2d 613.

 "Whether conduct constitutes . . . negligence depends upon the circumstances of a given case and is ordinarily a question for the trier of fact; . . . negligence may be determined as a matter of law, however, when the evidence is so clear and undisputed that reasonable persons could not disagree." *Rossmoor Sanitation, Inc.,* 13 Cal.3d at 629, 119 Cal.Rptr. at 453, 532 P.2d 97; *Hartford Cas. Ins. Co.,* 123 Cal.App.4th at 301, 20 Cal.Rptr.3d 128. Here, the parties clearly dispute who was at fault for the flooding. For instance, the parties dispute whether the irrigation system was defectively designed and whether Advanced was required to rectify the deficiencies by installing a master shutoff valve and flow regulator in the Project's irrigation system. Under the subcontract's indemnity agreement, Advanced is not obligated to indemnify Coury "to the extent" Coury's "negligence or willful misconduct" caused the liability, Spunt Decl. ¶ 5, Exh. A, while the Golden Eagle Policy excludes Coury as an additional insured to the extent the injury arose out of Coury's sole negligence or wrongdoing.[8] UMF 31–32; Schulz Decl. ¶¶ 5–6, Exhs. A, C–D. Given the material facts in dispute about Coury's negligence or wrongdoing, plaintiff's request for equitable indemnification of the claims for property damages, as well as declaratory relief on its claim that defendant Golden Eagle must indemnify it for Ethan Allen's business loss,

cannot be determined on summary judgment, *see,* e.g., *Hartford Cas. Ins. Co.,* 123 Cal.App.4th at 304, 20 Cal.Rptr.3d 128; Croskey et al., *California Practice Guide: Insurance Litigation* ¶ 8:81 (Rutter); thus, plaintiff's motion for summary judgment must be denied.[9]

For all these reasons, plaintiff's motion for summary judgment or, alternatively, partial summary judgment is **DENIED**.

---

**8.** The Commercial Liability Gold Endorsement also includes a professional services exclusion that the Court need not address at this time.

**9.** Based on this conclusion, the Court need not address any other issue the parties raise.